## MAKIN v. PETTIBONE CATARACT PAPER CO.

(Supreme Court, Appellate Division, Fourth Department. March 7, 1906.)

1. MASTER AND SERVANT—INJURIES TO SERVANT—DANGEROUS MACHINERY—ASSUMPTION OF RISK—QUESTIONS FOR JURY.

In an action for injuries to a servant whose hand was drawn between the rollers of a machine used in manufacturing paper, evidence *held* to justify submission to the jury of the question whether plaintiff assumed the risk.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, §§ 1068-1088.]

2. SAME—NEGLIGENCE OF MASTER—FAILURE TO GIVE WARNING—QUESTIONS FOR JURY.

In an action for injuries to a servant whose hand was drawn between the rollers of a machine used in manufacturing paper, evidence *held* to justify submission to the jury of the question whether defendant was negligent in not warning plaintiff of the dangers incident to the operation of the machine.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, §§ 1044-1050.]

Williams and Nash, JJ., dissenting.

Appeal from Trial Term, Niagara County.

Action by George A. Makin, by guardian, against the Pettibone Cataract Paper Company. From a judgment for plaintiff and from an order denying a motion for a new trial, defendant appeals. Affirmed.

This action was brought to recover damages for personal injuries alleged to have been sustained by plaintiff through the negligence of the defendant, while in the defendant's employ, working in a paper mill. The accident occurred on the 4th day of March, 1904. The plaintiff, a boy of about 16 years, was on that day put at work as back tender on a machine consisting in the main of two sets of rollers, used in the manufacturing of paper. His hand was caught between the rollers and crushed. Other facts appear in the opinion.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, NASH, and KRUSE, JJ.

Maulsby Kimball, for appellant.
Robert H. Gittins, for respondent.

KRUSE, J. I think the judgment appealed from should be affirmed. While it is true that this boy, the plaintiff, had worked around the mill for some time before the accident, he had never before done the work which he was attempting to do when he was hurt. It was dangerous, and required close attention, quickness, and skill. He received no instructions or warning of its dangers, some of which were hidden and unknown to him, and the very first attempt he made to dispose of the waste paper his hand was suddenly drawn with the paper toward and between the fast revolving rollers and crushed. The work he was doing was called "back tending." There were two sets of rollers. The two sets were about 2½ feet apart, and the plaintiff was required to work in this space. Up to about a month prior to the accident there had been about 5½ feet of space between the two sets of rollers, but additional dry rollers had been added and the space narrowed; thus in-

creasing the danger. Until this space was narrowed the waste or spoiled paper had not been drawn toward and caught of itself between the two lower calenders as will be presently described. The paper in process of manufacture passed over and between one set of rollers known as the "driers," and then across to the other set known as the "calenders," from which it wound on a reel. At times the paper would break in passing from the driers to the calenders, and then wind around the last drying roller. The back tender was then required to go between the two sets of rollers and quickly cut the paper from the dry roller, where it was accumulating, whereupon the paper, instead of passing up over the calenders, would fall upon the floor between the two sets of rollers. This waste or spoiled paper was then put between the two lower calender rollers and carried away, dropping on the other side of the calenders. After the slack had been thus taken up the paper was snapped off, and the end nearest the drier taken over to the calenders and placed between the two upper calender rollers, and the process of making and finishing the paper was resumed. When the paper broke, it required prompt, quick, and accurate work, for the machinery was kept in motion; the paper accumulating at about 250 feet a minute and falling upon the floor. It was necessary to get rid of this paper and slack expeditiously to prevent as little of the paper being spoiled as was possible, and it was this work which the plaintiff was doing, or attempting to do, when he was injured. When the machinery was in motion and the rollers revolving, there was a tendency to draw the waste paper toward the revolving rollers. What caused this dangerous tendency does not appear very clearly, and perhaps it is not very important. That it existed is scarcely disputed. The plaintiff was not informed of this danger, and did not know of it until his hand was drawn in between the rollers. I think it cannot be said as a matter of law that this danger was obvious and the risk assumed by the plaintiff. While he must have known that, if his hand was caught between the rollers, it would be injured, yet the jury were warranted in finding that this dangerous tendency to draw the material toward the roller was unknown to the plaintiff, and that reasonable care for the safety of this boy required the defendant to warn him of its danger. In this respect the case differs from those cited and relied upon by my Brother NASH, and, as I think, comes within the class of cases like Wyman v. Orr, 47 App. Div. 136, 62 N. Y. Supp. 195, and Welle v. Celluloid Co., 175 N. Y. 401, 67 N. E. 609.

As I view it, the case was one for the jury. The questions were submitted to them with clearness and accuracy by the learned trial judge, and, they having found upon these questions adversely to the defendant, their verdict ought not to be disturbed. The other points urged upon our attention by the defendant's counsel have not been overlooked, but none of them, I think, are such as to warrant granting a new trial. The judgment and order appealed from should be affirmed.

Judgment and order affirmed, with costs. All concur, except NASH, J., who dissents in an opinion, and WILLIAMS, J., who dissents on the ground that the finding of the jury that the risk was not assumed is contrary to the evidence.

NASH, J. (dissenting). The plaintiff, a boy about 16½ years of age, while at work as "back tender" of a machine used in the manufacture of paper in the defendant's mill, had his hand drawn in between two rapidly revolving iron rollers and injured, so that amputation at the wrist became necessary. The machine was some 75 feet in length, consisting of two sets of horizontal metal rollers, one set known as the "drier" rolls and the other as the "calender" rolls. The drier rolls were hollow, three feet in diameter, filled with steam for drying paper, and arranged eight on the bottom row and seven on top. The paper is fed into the drier rolls at one end known as the "wet" end, being then of a pulpy consistency, and run over the drying rolls is dried out, and is then perfect paper, except that it is required to be smoothed or calendered. The calender rolls consisted of 10 steel rollers set up in a vertical stack, one directly above another and resting on the next one below it of its own weight. These rollers were about 8 feet long, larger at the bottom and smaller toward the top of the stack. The bottom roller was 15 inches in diameter, the one next above 12 inches, etc. The place of contact between the two bottom rollers, called the "pinch," was some 30 inches above the floor. The calender stack stood at the end of the drier rolls and placed so that there was a space of 2½ feet between the drier and calender rolls. In the operation of the machine, the paper was dried out by the drier rolls, and ran between the last drier roll and the "spring roll" so called, up between the two top calender rolls, and down to the bottom of the calender stack by passing round back and front, respectively, of each alternate roll. After passing through between the two lower calender rolls the finished paper ran upon a reel or winder.

In the ordinary operation of the machine, the paper often broke at a point between the drier and calender rolls. The breaking of the paper at this point was of frequent occurrence—two or three, and often more, times a day. When this happened, the paper coming over the driers would wind around the last roll and accumulate. In order to start the sheet through the calender rolls again, the operator would take a knife, go into the space between the drier and calender rolls, and cut the paper on the last drier, cutting it the entire length of the roll. When this was done, the paper would run down into the space between the drier and calender rolls and accumulate on the floor. Then to get it away, he would take hold of some part of the paper which had accumulated on the floor and shove it between the two bottom calender rolls. The rolls would take up the slack and carry it off. This waste paper would then drop on the floor in a pile on the other side of the calenders. When the slack was taken up and the paper was running clear from the bottom drier rolls to the bottom calender rolls, the operator would snap the paper off between the drier and calander rolls, carry the end up to the top of the calender rolls, and put it between the top rolls. An operator on the opposite side of the calenders would see that the paper came back through the next pair of rollers, and so on until it was running regularly. Three men usually operate the machine. The machine tender has charge of the machine. His usual place of duty is at the wet end of the machine. There is, then, the back tender who assists the

machine tender, and whose duty it is usually to handle the paper when it breaks at the calender end of the machine. The other man is known as the "third hand." Prior to the time of the accident the plaintiff had been working in the plant about 11 months. He was first employed in the pulp mill. After working in that department a month and a half, he went to work oiling machines. Then he was engaged in painting about the factory, from that back to oiling again about a month, and then he was employed as third hand on this machine. He had worked in that position about three months next prior to the accident. On the day of the accident the back tender did not come to work, and Adams, defendant's superintendent, directed Flay, the foreman, to have the plaintiff do the work for that day, which Flay did, and had another employe take third-hand work.

The plaintiff was the only witness as to the manner in which the accident occurred. The paper broke several times the day of the accident. His testimony is:

"Flay told me to go and do the back tending. I then stayed round all day, that day, until it broke, and Mr. Brown [the machine tender] did the back tender's work. The paper broke at the calenders, and I went to do it, and Mr. Brown did it. It broke later and he did it. He fixed the paper so it would run. It broke later, and he did it every time, until about half past 4 it broke, and he was down cleaning up the screens and I went in to do it, and I cut it off and it fell on the floor, and I went to stoop to pick it up, and I had my hand on it, and all at once it went in itself. I had not put the paper through there before. I went and cut it off and I had to jab at it lots when I come to cut it off, and it all piled on the floor. I put my right hand down to grab it, and put my other hand on the top to shove it in, and all at once it went quick just so fast, and pulled my right hand in so I didn't know where it went. I put my right hand in it. There was paper under my right hand and paper over my right hand. My left hand was on top of that that just came out. It piled up fast. When my hand went in with the paper, it went between the rollers. I guess the two bottom calender rolls."

The complaint states a cause of action under the employer's liability act. It alleges the giving of the notice to the defendant required by the act, and that the defendant caused the ways, works, and machinery of the mill to be and remain defective, because of which, and the absence of instructions in regard to the danger thereof, the plaintiff was injured. The court held that the plaintiff had failed to prove a cause of action under the liability act, but that the complaint sufficiently stated a cause of action at common law.

The question submitted to the jury was whether the defendant was negligent in failing to properly instruct the plaintiff in operating the machine as back tender. No instructions were given to the plaintiff at the time he was directed to do the work of a back tender. It was known to the superintendent that the plaintiff had been familiar with the operation of this machine for some 11 months. As oiler, he was over and around every part of the machine a month at a time for two months. His work as oiler and third hand made him acquainted with the duties of a back tender. While at work as oiler and third hand, he had seen the paper break between the rolls several times daily, saw the paper pile upon the floor, and the operation of cutting the paper from the drier roll and running the waste through the bottom calender rolls. He

97 N.Y.S.—57

says he did not himself attempt to do that part of the work on the day he was put at back tending, until about half past 4 in the afternoon, but it broke several times during the day and was fixed, he says, by Brown. Brown says that he put the paper through the calenders several times the day of the accident; that Makin tried several times during the day to cut the paper from the dry roll, and he (Brown) had to help him, because, he says, "I could get it off quicker"; that Makin saw him cut the paper and start it through the calenders. Brown, who was called as a witness for the plaintiff, says that it requires skill to do the work of cutting the paper off from the dry roll and putting it through the calenders without getting caught; that the only particular danger is in getting the hands of the operator caught in the calender rolls; that there is no danger attendant upon cutting off the paper from the dry roll. The machine at this part is simple in operation, and the danger is apparent. Every one knows the result of putting the hand between two rapidly revolving heavy steel rollers. The plaintiff on his cross-examination testified:

"Q. Why did you go in between the dry rolls and the calender rolls on that day? A. Mr. Brown wasn't there, and I was supposed to be back tender. Q. How did you know, nobody had told you, that was the thing to do? A. The foreman told me to be back tender. Q. How did you know what a back tender had to do? A. I just seen them monkeying around there. I was not doing that at the time I was hurt. I had hold of the paper. Q. You were doing what you had seen others do? A. Yes, sir. Q. The same thing? A. Yes, sir. Q. And that is the reason you went in to do it, what you had seen Mr. Brown do? A. Yes, sir; I had never seen anybody else put the paper through there besides Mr. Brown. Q. How did you know the paper had to go through there? A. I knew they jabbed it, because, when I was oiler, I often saw them shoving them piles, putting it in. Q. You had seen them when you were oiling? A. Yes, sir; I hadn't seen them as third hand. Q. When you went to work as back tender, from what you had seen them do when you were oiling you knew the paper had to go through? A. I didn't know how it had to go through. I didn't take any particular notice how they did it, I knew it had to go through. I knew they pushed it, or something. Q. You knew they put it between these rolls? A. Yes, sir. Q. So that was what you were doing? A. That was what I tried to do. Q. That is what you were trying to do at the time? A. What I tried to do; yes, sir. Q. And that was the time you got your fingers pinched? A. Yes, sir. Q. How did you know it had to go through the bottom pinch at the time? A. Because I had seen them put it through. Q. Seen who put it through? A. The back tenders. Q. While you were working at what? A. Oiling around. Q. And as third hand? A. I might have seen them once or twice. Q. You knew that was the thing to do when the paper broke, did you? A. Yes, sir. Q. After the paper broke, and after you got up there, what did you intend to do with the paper? A. Try to put it through the top. Q. You knew that was what they did with the paper after it broke? A. Yes, sir. Q. So you were just getting ready to go ahead and do those things, is that it? A. Yes, sir."

It thus appears that he had often seen this particular work done, knew the whole operation, and in the absence of Brown attempted to perform it. No oral instructions would have given him any further information than he already had as to the manner of doing the work and the dangers attending its performance. Under the circumstances it cannot be held that the master was negligent in failing to give instructions. Crown v. Orr, 140 N. Y. 450, 35 N. E. 648; White v. Wittemann Lithographic Co., 131 N. Y. 631, 30 N. E. 236; Buckley v. G. P. & R. M. Co.,

113 N. Y. 540, 21 N. E. 717; Ogley v. Miles, 139 N. Y. 458, 34 N. E. 1059. In Crown v. Orr the plaintiff, an infant, was directed to place a hood on a planing machine in place, which was about eight inches in front of the knives. In doing this, his hand was caught by the knives and he was injured. He had not been employed to operate this machine. Held, that, assuming plaintiff received the order as testified to, this and the failure to give instructions did not charge the defendants with personal negligence; that plaintiff had full opportunity to observe the manner of handling the hood and placing it upon the machine, and it was not negligence to request him to put it in place without instructions, especially as he asked for none, and showed in no way that he was not familiar with the method of doing it; that, if the operation was especially dangerous without instructions, the danger was obvious and he was not bound to obey the order, and in doing that he took the risks.

The plaintiff here was put at back tending, one of the duties of which was to cut the paper from the drier when it broke, and put it through the calenders. It seems, however, that the plaintiff was not required to do this particular part of the work through the day until the plaintiff attempted it. This part of the work was done by Brown the machine tender. The plaintiff was told to go and do the back tending.. He says:

"I then stayed around all day, that day, until it broke, and Mr. Brown did the back tender's work. The paper broke at the calenders, and I went to do it. That day I did the same as third-hand work. I stayed there until the paper broke at the calenders. I went to do it and Mr. Brown did it. He fixed the paper so it would run. It broke later, and he did it every time, until about half past 4 it broke, and he was down cleaning up the screens and I went in to do it."

In Ogley v. Miles, the plaintiff, a boy 16 years of age, was operating a buzz saw. His hand came in contact with the saw, and he was injured. He had only been engaged in the work for the defendants two days, but had experience in other factories and understood the practical working of the machine. Held that the omission to give the plaintiff oral information of the dangerous character of the buzz saw did not make the defendants liable. In White v. Witteman Lith. Co., held, in an action to recover damages for injuries received by an infant, who is sui juris, from coming in contact with machinery while in defendant's employ, proof that the employer omitted to instruct the employe as to using the machinery does not impose liability upon the former, provided the latter knew by experience or observation the nature of the machinery and the danger to be apprehended from it. About a month before the accident to the plaintiff two additional drying rolls were put into the machine, which narrowed the space between the drying and calender rolls from 5½ to 2½ feet. It appears that after this space between the rolls was narrowed the paper which accumulated upon the floor when broken frequently filled up the space between the rolls, and occasionally caught of itself and went between the calender rolls. This the plaintiff swears he had not observed prior to the accident. The point is made that the defendant was negligent in not instructing the plaintiff that paper would go in between the calender rolls of itself. It

was not shown that this rendered the operation of cutting the paper and putting it through the calender rolls more dangerous than before, or that there would have been the slightest difficulty in extricating one's hands from the paper.' Brown says that, if the paper running on the floor is not kept down with the feet while cutting the paper, it will sometimes catch and go in the calenders itself and start running through. It is liable, he says, to do that, whether you do the best you can with your legs to keep it in front of you. But his testimony is that the particular danger is to keep the hands from getting caught in the calenders. It was the only danger he knew of. It was apparent that, if the paper was allowed to accumulate and pile up against the calender, it was liable to be drawn in. The paper going in between the calenders of itself was not the occasion of the accident. The plaintiff, after stating that he cut the paper and it fell on the floor, testified:

"Q. What were you trying to do at the time you picked up the paper? A. I was going to put it in. Q. In between the calenders? A. Yes, sir; I was going to pick it up. I had one hand on the folds and the other hand on top. My hands came in contact with the paper. I was not shoving it towards these calender rolls. Q. What were you doing with the paper at the time? A. Just hold of it, trying to push it in. Q. You were just trying to push it in? A. No, sir. Q. What do you mean? A. I just took hold to try to push it in. Q. You knew it had to go through there then? A. Yes, sir. Q. You knew it was your business to put it through there? A. Yes, sir. Q. And so that is what you were just getting ready to do? A. Yes, sir."

From this it appears that the plaintiff had his hands in and upon the paper for the purpose of putting it between the calenders. If there was force sufficient of itself to draw the paper in, liability of getting the hands caught was no greater than if the paper was being pushed in by hand. There was no evidence that the paper going in of itself had ever caused an injury to any one. If there was danger of injury from this cause, it was unknown to every one employed about the machine, unknown to the defendant, and therefore the injury to the plaintiff was the result of an accident, which could not have been foreseen. In Hickey v. Taaffe, 105 N. Y. 26, 12 N. E. 286, the plaintiff, a young girl about 14 years and 7 months old, was employed by defendant in his laundry to feed collars to an ironing machine. She was instructed how to do the work, but was not instructed as to the danger of the employment. She worked the machine safely, however, for six weeks, during which she became acquainted with and fully appreciated the danger to be apprehended from allowing her hand to be caught between the rollers of the machine, which was of a kind ordinarily used. There were several of the kind in use in the laundry, and no operator or feeder had ever been caught. After one end of the collar had passed through the rollers, in endeavoring to straighten out the other end, which lapped over, one of the plaintiff's fingers was caught in the buttonhole, and being unable to extricate it in time her hand was drawn between the rollers and badly crushed and burned. In an action to recover damages, held defendant was not liable, conceding that there was a neglect of duty on the part of the defendant in not advising plaintiff of the dangers to be apprehended. The injury did not occur on account of any act done or omitted on her part because of want of knowledge or apprecia-

tion of the dangers, but was the result of an accident, which could not have been foreseen and for which no one was at fault.

Within the principles of that case, as well as the rules generally applicable to the case here, the motion for a nonsuit should have been granted.

Judgment reversed.

WILLIAMS, J., dissents upon the ground that the finding of the jury that there was no assumption of risk is contrary to the evidence.